We'll hear next from counsel in the matter of NLRB v. John Gore. Thank you. Case number is 23-7087. Even though I've been warned in advance that this was going to confuse me. We're starting with Mr. Carnaro, I believe, right? All right. All right, Mr. Carnaro, you've reserved two minutes for rebuttal. Whenever you are ready, you may start. Good morning, Your Honors. May it please the Court, Enrique Carnaro on behalf of John Gore Theatrical Group, respondent in this case. In this information request dispute, Gore agreed to provide all of the union's requested confidential information as long as the union agreed that it would use that information only in connection with NLRB grievance procedures. By ordering Gore to disclose all of the information with no confidentiality protections, the Board committed three errors, which I'll discuss each one of them. But in sum, first, the Board failed to recognize that Gore satisfied its obligations under the NLRA when it agreed in principle to provide all of the requested information while also coming forward with a reasonable proposal for how to safeguard the confidentiality of that information. Second, the Board misread investment agreements, which prohibit Gore from disclosing much of the requested information. And third, the Board failed to recognize that those investment agreements properly interpreted, along with other evidence in the record, establish Gore's legitimate and substantial confidentiality interests. So if we find that a private agreement to maintain confidentiality is sufficient, couldn't every employer just make sure that every financial transaction they entered into, they said to the other side, hey, can we agree to keep this private between us? And the other side said, sure. Then if everything's covered by a nondisclosure or confidentiality agreement, you're exempted, basically, from these disclosure requirements. That's absolutely right, Your Honor. And that was the reasoning in the Crozer-Chester decision that the Board relied on, the Third Circuit decision the Board relied on here. Now, the difference is that we aren't really contracting around the NLRA here. And as we attempted to make clear and argue in our briefs, really, the contracts are just more evidence of the inherent sensitivity of the covered information. So if you look, for example, at Requests 1 and 9 that the union served on John Gore, those asked Gore to describe its financial interests in a high level of detail, Request No. 1 specifically goes to equity interests. No. 9 goes to non-equity interests. Again, these are investment interests in every theatrical production that Gore has invested in. And that's the nature of the problem here, right? Doesn't the allegation here have to do with affiliated entities, with sort of diversion of performances or productions to affiliated entities? That's right, yes. So isn't this information about who else John Gore has invested in personally relevant? It is. And to be clear, we would provide all of that information to Gore. The issue here is to the union. The issue here is what will the union do with that? That's what the dispute is here. And so the board looked at the investment agreements that were in the appendix and said, well, you know what, actually, even apart from the issue that contracts by themselves are not enough, which we agree with but we contend is not the case, not the issue in this case, even apart from that, these contracts don't even apply because they only cover information that Gore receives as a result of its investment. And here the request was for the nature of the investment. So it doesn't really, in the board's view, fit in. But that was just a misreading of the relevant agreement. If you look at page A-122 in volume one of the joint appendix, the agreement broadly defines the covered confidential material that it brings within its scope, and there's a straightforward prohibition on the disclosure of that material. The board really latched onto one sentence in that paragraph, not which it pretended effectively was the only operative language, but that's just a misreading of the agreement. But didn't Gore have to say more as to why there was a legitimate and appropriate privacy confidentiality interest here aside from just pointing to the agreements for – because as I think you acknowledge, those agreements themselves can't be enough. Your Honor, Gore said in its first substantive response to the union exactly what its concerns were. For that category of information, it referenced the confidentiality agreements. That's right. I would actually – I would point to the GC's opening statement before the ALJ hearing, which is on pages A-20 through 21 of the joint appendix. It's very difficult not to interpret that excerpt of the GC's position on the record as almost like a concession that the reference to the third-party NDAs was a satisfactorily communicated concern by Gore. So to answer your question, Gore did not have to say more than it said. And as for the other category of information, which goes to individuals' identities, essentially, Gore made clear from the start that this is people's identities. We hold that confidential. And then before any NLRB grievance was ever filed, there were telephonic communications between Gore and the union's counsel where Gore's concerns were described at a high level of detail. So there's no reason for the board to have focused in with a magnifying glass on what specific words were used in the first-letter response to the union. We think that the concerns were adequately communicated from the get-go. The record unambiguously reflects also that the union understood the limited nature of Gore's request, that it would not interfere at all with the union's ability to use all of the information, again, in connection with the very purpose why it requested this information, which was to assess whether to bring a claim before the NLRB. How could they bring a claim before the NLRB using that information without disclosing the substance of it, at least in filings before the NLRB, that would be public? And they may be public in that context, but that would at least — the real concern here was we don't want these things to go on social media, to go to the media. And there was history of that happening. And so — There wasn't much of a history of it happening. There was enough, Your Honor. And really what we needed was very crystal clear in the record, which was an admission on lines two through four of page A59 of the appendix, that the union had done this and that union members had done this specific thing in the past. Would that confidentiality agreement that you argue is necessary mean that the union could not convey that information or any part of it to their members? We actually, to be honest, the negotiations didn't even go that far between Gore and the union. But that would likely be one of the requests that Gore would make, is really what Gore wanted was some sort of an agreement, a representation, that what had happened in the past with other employers would not happen with Gore here. But aren't you putting the car before the horse there? You only get to that point if you establish a legitimate and appropriate interest here. And we did, Your Honor. And there are — and you can make that conclusion by looking at the nature of the information. The board has repeatedly held that information that's highly analogous to what was requested here is subject to an employer's legitimate concern. In substance, it's highly detailed investment information that a company would not want its competitors to know about. And then, on the other hand, individuals' personal information, which implicates privacy concerns. If there are no further questions, I'll reserve the rest of my time for rebuttal. Thank you, counsel. All right. We'll hear from the board. Ms. Isbell. Thank you. May it please the Court, Kelly Isbell here on behalf of the National Labor Relations Board. The first question that has to be answered in a case like this is whether Gore established a legitimate and substantial confidentiality interest in the information the union requested. That question has to be answered in the affirmative before we get to the other questions of signing NDAs, for example. The board does not rely on blanket statements of confidentiality, and it does not rely on third-party contracts to establish confidentiality. The company has to come forward with some reason why the information should be held confidential. And Gore never crossed that hurdle with this information. It repeatedly stated that the information was confidential or proprietary or nonpublic. Their first substantive response to the union was that much of the information is confidential, and as you know, most of it is nonpublic. And that was the sum total of their response to the union. And they sent an NDA. The NDA not only forbids them from releasing any information, it forbids them from even saying that they have an agreement with John Gore, and it holds all information they get from John Gore before, during, or after the signing of the nondisclosure agreement confidential, all information. The union in its amicus brief called that onerous. I am not an expert in NDAs. It certainly seems to go beyond what Gore itself says it needs to protect this information. But before the board will even think about what the union should be offering in terms of confidentiality, the board needs to find that there was a legitimate and substantial confidentiality interest. Under board law, that list of those kinds of information are restricted. It's information that might release employees' personal information, their personal medical information. It could be trade secrets. But it's not any kind of information that a company just wants to hold nonpublic because it might be embarrassing if it gets out, or they just don't want the union to know. That's not confidential under board law. I would also like to point out that these third-party agreements, beyond the fact that the board doesn't rely on them alone to establish confidentiality, there are two that are in the record. According to John Gore's general counsel, there are between 50 and 100 confidentiality agreements with third parties. The union has never seen those. I have never seen those. They're not in the record. We don't know what they say. We don't know with what organizations they are, if they're with the John Gore Theatrical Group, if they're with John Gore Organization, or one of the other affiliates of John Gore. And we have no idea what kinds of information they restrict. What we do know on the basis of these two that are in the record is that they restrict information received as a result of the investment. The union asks for a list of productions that John Gore had an equity interest in and a description of the equity interest. It did not ask for the amount of money invested. It just said describe the equity interest or describe the managerial interest. Wouldn't that be a percentage? Would that be in a percentage? I don't actually know, but they seem to know. The parties, it turns out, with a little Googling, Broadway investment is a very specific and particular thing. Both parties seem to know what the union wanted. And if John Gore didn't know what information the union wanted, under board law it can, of course, ask for clarification. If you don't understand what the union really wants, you can ask. And they didn't. Both parties seem to know. In response to a grievance the union filed, John Gore did actually provide some information. They provided a list of productions, indicated whether or not they were the general partner, indicated whether or not they recouped their investment, and whether networked productions, one of the companies the union was concerned about, was involved in the production. And the union said that partially fulfilled their information request. So John Gore could and did turn over some of the information that the union wanted. So showing me and the board that not all of the information was covered by those third-party agreements, even if you agree that the third-party agreements covered it. If you have no questions, I'll... Thank you, counsel. Thank you. And Mr. Cornero, you've reserved time for rebuttal. Two minutes. Your Honors, merely refusing to provide information that a union requests in the exact form and manner that the union is insisting on as a matter of law is not enough evidence to satisfy us showing that the employer violated the NLRA. That's the only piece of evidence that would arguably go against John Gore in the record here. The court should pay attention to four categories of evidence. First, what's the nature of the information? Here it was sensitive, specific investment information that's competitively sensitive and information that goes to individuals' privacy concerns. The next thing is, is there any evidence in the record of what the union has done in the past that would substantiate the employer's concern and the employer's desire to keep this protected in some way? Third, in light of those first two categories of evidence, how limited was the employer's proposal? And then finally, the union's response to the union's reaction to the employer's proposal. All four of those categories of evidence weigh overwhelmingly in Gore's favor here. And those are the categories of evidence that this Court considered in all of Eddie's office, and it deemed them dispositive. And if you apply those categories of evidence and you prioritize those, then the result is clear. I just wanted to briefly say that we repeatedly said that this was proprietary information from the very beginning. And, see, that's just a synonym for competitively sensitive. The Board appears to be asking for one kind of specific talismanic language over another kind, and that just doesn't really make sense. This is supposed to be more of an organic and informal way of communicating. And if the Court applies what the Board wants, it'll encourage employers to treat these communications like, now I have to write a brief in this letter and I have to list out every single argument I may have or else I'm not going to be able to raise it later in litigation. And we don't think that the Court should adopt that approach here. Thank you, counsel. We have your arguments. Thank you both for your arguments today. We will reserve discussion.